UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIE SALYER,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:26-CR-00045-DCLC-CRW |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Willie Salyer's Motion in Limine Seeking Suppression of Evidence Seized Following Unlawful Extension of Traffic Stop [Doc. 14]. Defendant asks the Court to suppress the evidence seized at the traffic stop that occurred on July 1, 2024. The Government has responded in opposition [Doc. 15], and the Court held an evidentiary hearing on the matter on September 28, 2026.

Defendant argues that law enforcement extended the duration of the traffic stop beyond the time necessary to complete the mission of issuing a warning ticket without reasonable suspicion to do so, making the prolonged stop unlawful. Because the Court finds that law enforcement had reasonable suspicion of ongoing criminal activity, Defendant was not unlawfully seized, and the motion is **DENIED**.

## I. BACKGROUND

### A. Initial Investigation

At the evidentiary hearing, Detective James Legg with the Sullivan County Sheriff's Office testified that he began to investigate Defendant in the spring of 2024. Detective Legg was familiar

with Defendant from his prior encounters with law enforcement, including repeated incarcerations and a history of evading officers.

Around April 2024, Detective Legg began listening to recorded jail calls between Defendant and Kayla Crigger, who was incarcerated at the Sullivan County Jail on drug-related charges. During one call, Defendant told Ms. Crigger that he was in Atlanta, Georgia to see a doctor. Detective Legg suspected that Defendant was referring to a drug supplier rather than a physician because, in his experience, individuals involved in drug trafficking use the term "doctor" to conceal the nature of their conversation.

On April 30, 2024, as Detective Legg conducted physical surveillance of Defendant, he observed Defendant and his known associate, Thomas Winston, driving away from the Kingsport courthouse. A local patrol officer noticed that their vehicle's window tint appeared to violate Tennessee law and initiated a traffic stop. Mr. Winston slowly drove in a circuit around a parking lot once before stopping. During the stop, a narcotics K9 alerted on the vehicle. Officers searched the vehicle and found two glass pipes in Mr. Winston's possession and cash in Defendant's possession. In subsequent recorded jail call to Ms. Crigger, Defendant stated that he encouraged Mr. Winston not to stop because "they had a bunch of stuff with them."

On May 23, 2024, officers interviewed Saundra Hamilton, whom Detective Legg identified as Ms. Crigger's drug supplier. Ms. Hamilton disclosed that she sold large quantities of narcotics to Defendant—as much as two kilograms per week—and she obtained these narcotics in Atlanta. Sometime in the spring or summer of 2024, Detective Legg obtained a ping search warrant for

Defendant's phone and began monitoring his location to see if he was travelling to and from Atlanta.[1]

## B. The July 1, 2024 Traffic Stop

On July 1, 2024, Detective Legg observed phone pings placing Defendant's cellphone in the Atlanta area. He continued monitoring the phone until its location showed Defendant traveling toward East Tennessee. Detective Legg then contacted Tennessee Highway Patrol's ("THP") Interdiction Unit and requested a "whisper stop."[2] He informed THP that he believed Defendant and Mr. Winston were traveling in a red Ford F-150 truck and were coming back from Atlanta with narcotics. Detective Legg himself travelled to Interstate 40 near the Strawberry Plains exit and waited for Defendant and Mr. Winston to pass by. When Detective Legg observed a red truck pass his location and leave the interstate at Exit 8, he conveyed that information to THP.

THP Troopers Ruff and Vaughan were assigned to the area that day. They were parked in marked patrol vehicles off Exit 8 directly across from a gas station. Coincidentally, the red truck pulled into that gas station, and Trooper Ruff could observe the occupants from his patrol car. Trooper Ruff watched a man come up to the truck and speak with the occupants—Defendant, Mr.

---

1 Detective Legg prepared a report describing additional surveillance on Defendant and Mr. Winston. At the hearing, however, he acknowledged that another officer had conducted portions of that surveillance and that he could not attest to the accuracy of these portions of his report. As a result, although the Court finds Detective Legg was otherwise credible, it will not rely on any surveillance or any other evidence from the initial investigation into Defendant or Mr. Winston that Detective Legg did not personally witness or establish through his testimony. The Court notes that the Government's response to the motion [Doc. 15] includes many details about the initial investigation into Defendant (and Mr. Winston) that Detective Legg did not testify to or could not remember. The Court limits its factual findings on the initial investigation to the evidence established through Detective Legg's testimony.

2 Trooper Ruff described a "whisper stop" as one where law enforcement has reasonable suspicion of criminal activity as part of an investigation they are conducting on an individual, and an officer initiates a traffic stop on that individual for reasons unrelated to that investigation. This is done to avoid showing law enforcement's hand that they are investigating the individual.

Winston, and Mr. Winston's son—for some time. He considered that unusual. He also saw them rummaging through the back of the truck and throwing at least one unidentified package away. Suspecting that they may be disposing of evidence, he asked another agent working on the case to check the trash can.

Trooper Ruff followed the truck as it left the gas station and returned to the interstate.[3] He paced the truck and observed it travelling between 77 and 80 miles per hour in a 70 miles per hour zone. He then initiated a traffic stop for speeding, and the truck pulled on to the right shoulder.

Mr. Winston was driving the vehicle with his son Bejamin in the passenger seat and Defendant in the back seat. Trooper Ruff approached the truck and notified Mr. Winston that he was speeding, but that he was only going to give him a warning for the violation. He then asked Mr. Winston for his license and registration. While Mr. Winston was looking for his documentation, his son Benjamin asked if the trooper saw the man who approached the truck at the gas station. [Doc. 15-2 at 1:43-2:04]. When Trooper Ruff asked Benjamin what he meant, Benjamin replied, "the gas station right here. You guys were sittin' right there at the gas station." [*Id.*].

Mr. Winston provided his license to Trooper Ruff and stated that truck's registration was valid. Trooper Ruff then asked Mr. Winston to step out of his vehicle and accompany him to his patrol car while he issued him a written warning, explaining that this was his usual practice during traffic stops. While walking back to the patrol car, he requested for a K9 to arrive on scene. Trooper Vaughan confirmed one was already en route.

---

[3] Trooper Ruff testified to the events on July 1, 2024 at the hearing. Additionally, his body cam footage [Doc. 15-2], in-car camera [Doc. 15-1], and Trooper Vaughn's in-car camera [Doc. 15-3] captured the traffic stop, starting from the time Trooper Ruff began following the truck on the interstate.

Over the next sixteen minutes, Trooper Ruff wrote the warning ticket and talked with Mr. Winston as he waited for the K9 unit to arrive. They discussed several topics, including the travel plans that day, Mr. Winston's drug and criminal history, and whether there were any guns in the truck. Trooper Ruff testified that he felt Mr. Winston was attempting to control the conversation and move it away from the questions Trooper Ruff was asking him.

Eventually, Trooper Clowers arrived with his K9 on scene. Trooper Ruff told Mr. Winston, "Alright, as long as it doesn't alert, I'm about done with this, and we'll have you on your way, ok?" [*Id.* at 18:43-18:47]. A short time later, he repeated, "I'm about done here, I'm just waiting on him (referring to the K9 handler). As long as he gives the green light that the K9 did not alert, then we will get you on your way, ok?" [Id. at 19:44].

The K9 alerted to the presence of narcotics in the vehicle. The troopers kept Mr. Winston in Trooper Ruff's patrol car and asked Defendant and Benjamin Winston to sit in the back of Trooper Vaughan's patrol car while they searched the truck. THP conducted a thorough search but did not find any narcotics.

Trooper Vaughan then reviewed his in-car video recording to determine whether either occupant had concealed or discarded narcotics while seated inside the patrol car. His in-car video showed Defendant trying to pull something from his pocket, but he stopped when Trooper Vaughan entered the car to turn it on. [Doc. 15-3 at 00:00-00:30]. He resumed once the trooper left. [*Id.* at 00:48-1:09]. A few minutes later, Defendant appeared to ask Benjamin Winston to shove something into the seat, [Id. at 2:41-2:55], and he handed him a wad of cash. [Id. at 4:08]. After watching this footage, the troopers removed the two from the back seat and searched it. They found eight Subutex strips stuffed between the seat cushions and a ball of suspected drugs under the seat where Defendant had been sitting.

## C. Procedural History

On October 13, 2026, a federal grand jury returned a multi-count superseding indictment charging Defendant with conspiracy to distribute fifty grams or more of methamphetamine, forty grams or more of fentanyl, and possession with intent to distribute five grams or more of methamphetamine. Defendant moved to suppress the drugs seized during the traffic stop, arguing that the officers unreasonably extended the duration of the stop beyond the time necessary to address the alleged traffic violation without reasonable suspicion to do so. The motion claims that the stop therefore became an unconstitutional seizure and that the evidence found because of the unlawful stop must be suppressed.

# II. ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons … and effects against unreasonable searches and seizures." U.S. Const. amend. IV. A traffic stop is a reasonable seizure if there was probable cause to believe a traffic violation occurred, regardless of the officer's subjective motivation for making the stop. *Whren v. United States*, 517 U.S. 806, 810, 813 (1996). But an initially lawful traffic stop '"can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

"To prolong a traffic stop beyond its original 'mission,' police must have reasonable suspicion of additional wrongdoing." *United States v. Jordan*, 100 F.4th 714, 718 (6th Cir. 2024) (quoting *Rodriguez*, 575 U.S. at 355); *see United States v. Salas*, 820 F. App'x 405, 412 (6th Cir. 2020) ("[O]fficers may … extend a stop to conduct a dog sniff when such action is supported by reasonable suspicion of criminal activity."). In deciding whether an officer conducting a traffic

stop has developed a reasonable suspicion of criminal activity, courts consider the totality of the circumstances "to see whether the detaining officer has a 'particularized or objective basis' for suspecting legal wrongdoing." *United States v. Belakhdhar*, 924 F.3d 925, 927 (6th Cir. 2019) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). The officer must point to "specific and articulable facts" that are "more than an ill-defined hunch." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)). The totality of the circumstances "includes the officer's own observations as well as information the officer receives from police reports, dispatch, and fellow officers." *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022). It also "involves commonsense judgments and inferences about human behavior, as well as inferences the officer may draw based on his experience and specialized training." *Id.* (citations and quotations omitted). In considering the totality of the circumstances, courts '"must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Perez,* 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith,* 263 F.3d 571, 588 (6th Cir. 2001)); *see Navarette v. California*, 572 U.S. 393, 403 (2014) (explaining that a reasonable suspicion analysis "need not rule out the possibility of innocent conduct." (citation and quotations omitted)). Additionally, under the "collective knowledge doctrine," courts may "impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion." *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012) (citing *United States v. Hensley,* 469 U.S. 221, 230-31 (1985)). Ultimately, the standard for reasonable suspicion is "not a high bar." *United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016).

Defendant does not contest that the troopers had probable cause to initiate the traffic stop. Instead, he argues that the troopers prolonged the traffic stop and continued to detain him after completing the mission of the traffic stop—that is, to give a warning ticket—without reasonable suspicion of ongoing criminal activity. Assuming the troopers did extend the traffic stop beyond its original mission to wait for the K9 to complete the free air sniff, the Court finds that the troopers had reasonable suspicion to prolong the stop.

When Trooper Ruff initiated the traffic stop, law enforcement had listened to phone calls between Defendant and Kayla Crigger, an inmate held on drug-related charges, where Defendant discussed being in Atlanta to "see the doctor," language that drug traffickers sometimes use to refer to a dealer. Law enforcement also knew that Saundra Hamilton, Defendant's previous source for large quantities of narcotics, transported those drugs from Atlanta to Northeast Tennessee. And law enforcement knew that Defendant was travelling on the interstate on July 1, 2024 as he was returning to Northeast Tennessee from Atlanta. Detective Legg had observed Defendant's April 30, 2024 traffic stop where officers found glass pipes on Mr. Winston and cash on Defendant. In a jail call with Ms. Crigger after this stop, Detective Legg listened to Defendant tell Ms. Crigger that he tried to get Mr. Winston to not stop for the police, as they had a "bunch of stuff" with them.

Trooper Ruff personally observed suspicious behavior at the gas station where a man came up and spoke to the truck occupants at length, and where they threw a package in the trash in full view of the troopers' marked patrol cars. And less than two minutes into the traffic stop, Benjamin Winston mentioned to Trooper Ruff that he had seen the troopers at the gas station, possibly suggesting that they did throw contraband away after they were spotted by the troopers.

Perhaps no one of these facts, standing alone, would establish reasonable suspicion. But based on the totality of the circumstances, Trooper Ruff had reasonable suspicion of criminal

activity to prolong the traffic stop to conduct a dog sniff. *See United States v. Winfrey*, 915 F.2d 212, 217 (6th Cir. 1990) ("While each factor by itself may be insufficient to establish reasonable suspicion that a crime was committed, articulable suspicion is based on an evaluation of *all* the surrounding circumstances as viewed by those trained in the law enforcement field." (emphasis in original) (citations omitted)); *Belakhdhar*, 924 F.3d at 928 (although "individual datapoints may portray entirely innocent conduct[,] ... our cases teach that the overall scatterplot may give rise to reasonable suspicion." (citing *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001))). By linking a known supplier selling Defendant large quantities of narcotics that she procured in Atlanta, jail calls with Ms. Crigger in which Defendant may have used coded language to discuss purchasing drugs in Atlanta, the April 30, 2024 traffic stop where officers found drug paraphernalia and cash on Defendant and his associate Mr. Winston, phone pings showing Defendant travelling to Atlanta, and suspicious behavior indicative of a drug transaction or disposal of evidence at the gas station, officers had more than "mere hunches or unsupported and passing notions." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008). Rather, they had a reasonable suspicion that Defendant was engaging in criminal drug activities that justified prolonging the traffic stop for the K9 sniff.

The collective knowledge doctrine connects Detective Legg's investigation to Tropper Ruff's decision to hold the truck until the K9 could arrive and conduct a free air sniff. Detective Legg advised Tropper Ruff that he believed Defendant and Mr. Winston were returning from Atlanta with narcotics, described the truck, and reported when it left the interstate at Exit 8. Trooper Ruff acted at the direction of Detective Legg who had the facts of the investigation. Those facts are imputed to Trooper Ruff, whether he knew them or not. *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012).

Defendant argues that two comments, one by Detective Legg and one by Trooper Ruff, demonstrate that neither had reasonable suspicion. During the evidentiary hearing on this matter, defense counsel and Detective Legg had the following exchange:

> **Defense Counsel:** So what we're hearing is you just kind of thought that [Defendant] was engaged in drug activity, right?
>
> **Detective Legg:** Sure.
>
> **Defense Counsel:** Just had a pit in your stomach, sort of a hunch that something was going on, right?
>
> **Detective Legg:** Correct.

Defendant argues that a hunch is not enough for reasonable suspicion. While that is correct, reasonable suspicion is measured by an objective standard. *Terry v. Ohio*, 392 U.S. 1, 22 (1968); *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."). *see also United States v. Cooper*, 1 F. App'x 399, 403 (6th Cir. 2001) (describing the objective standard for probable cause and holding that "the arresting officer's subjective opinion is immaterial."). The evidence here shows that a reasonable officer, with the information Detective Legg *and* Trooper Ruff had when the troopers extended the stop, would possess reasonable suspicion that Defendant was engaged in criminal activity.

After the K9 alerted and during the search of the truck on July 1, 2024, Trooper Ruff said, "I don't think it's going to be here. Just…eh…the interview, I really don't…I think that's legitimately what they did [in response to Trooper Vaughan saying that the occupants described returning from a suboxone clinic in Atlanta]." But this comment does not have any bearing on the reasonable suspicion argument, as it came after the officers had probable cause to search the truck

because of the dog alert. Further, like with Detective Legg's comment, his subjective belief does not affect the objective reasonable suspicion analysis.

## III. CONCLUSION

For the reasons stated herein, Defendant's Motion to Suppress [Doc. 14] is **DENIED**.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge